Bullabd, J.
In this cause, the court has had the advantage of an able *491 and elaborate discussion on both sides, as well in writing as oral, in which have been displayed the great resources of the bar in ability and varied learning. We have been enabled at our leisure to weigh the arguments and examine the authorities on both sides, and to give to the whole subject that patient and dispassionate consideration due alike to the vast interest at stake, to the character of the parties, and to public expectation. It would have been more satisfactory to ourselves if we could have been unanimous as to the final result; but as there exists some difference of opinion among the judges, I proceed to pronounce mine, and to set forth the grounds and reasons upon which it rests. I will not affect to conceal with what anxiety I examined again and again the principal question in the case, when I discovered that I should have the misfortune not to concur with the senior judge, who had been for so many years familiar with the vexed question of the batture in all its phases, while this is the first occasion, upon which it has been discussed, since I have been a member of this tribunal.
The municipality claims to be owner of the alluvial formation fronting the suburbs Delord and Saulet, between New Levee-street and Front-street, bounded on the upper side by Roffignac-street and by property in lots separating it from Benjamin; which lot or parcel of land, it is alleged, was formed by alluvion long after those suburbs were laid out as faubourgs of the city of New Orleans, and after they were actually attached to, united with, and incorporated into, and made a part and portion of the city of New Orleans, or was at each of the said epochs, so inconsiderable in its formation and [210] extent as to be incapable of individual possession, use or occupation of any kind whatever, without the use of artificial means, the -same being even at the lowest stages of the water of the river barely perceptible, and all the rest of the year entirely covered and forming a part of the bed of the river — by reason of which incorporation with said city (the petition goes on to allege) and the laying out and dividing the said land, of which the said faubourg is composed, into town lots, streets, &c., as a part of said city, the title to all the said batture or alluvion then so imperfectly formed, or thereafter to be formed, became by lam nested in the corporation of the said city of New Orleans, for the sole and exclusive use of the public' and is now vested in the plaintiffs. s
Upon the lot of ground thus described, it is alleged, the defendants have erected buildings and stores for pressing cotton, &e., and have appropriated the same to their sole and exclusive use as their property, and to the entire exclusion of the public, and have converted the natural and lawful destination of the said land to public purposes and uses into private property.
It is further alleged that within the last ten years there has been formed in front of the lot of land above described, by gradual deposit of the river, a considerable space of batture or alluvion, now vacant and unoccupied except for public uses, and which is in like manner vested in the said Second Municipality for public use and benefit, and that the defendants, pretending to claim the same as their private property, and as forming a part of the ground described, have menaced and, as the petitioners believe, are about *492 to occupy the same 'and to convert it to their own use to the exclusion of the public.
The plaintiffs conclude by praying judgment that the title is vested in the plaintiffs for the uses and purposes above mentioned, and that the defendants be for ever enjoined from any use, occupation or possession thereof and for damages.
[211] The defendants first pleaded the exception of res judieata founded upon the judgment rendered in the case of Henderson and, others v. The Mayor, Aldermen and Inhabitants of the city of New Orleans ; and in case the same should be overruled, they deny all the facts and allegations in the petition so far as they assert any color or pretence of title in the plaintiffs to the premises described: and they deny the plaintiffs’ title to any alluvion already formed or which may hereafter be formed in front of said premises.
The respondents further aver, that they are the riparian proprietors of the property claimed by the plaintiffs, and as such entitled to all the alluvion which has been formed or may be formed in front of their said property. That they possess the same with all its rights and privileges, and especially as a part thereof, the right of alluvion, in virtue of a sale or concession of the King of France. That the said property with all its said rights was vested in these respondents, and those through whom they claim, from the date of the said sale or concession, and that they cannot be divested of their right without, their consent, and without a just and previous indemnity. They further aver that the plaintiffs have repeatedly admitted and recognized their right and title by formally putting them in possession of sundry portions of batture successively formed before their property and attached thereto since the incorporation of the city in 1805, by charging them with all the burdens and duties of front proprietors, and by various other acts by which the respondents’ right is distinctly recognized.
Upon these pleadings the parties went to trial in the court below, and the-exception of res judieata having been sustained as to the lots of ground first described, upon which the defendants had erected their warehouses, aDdovez-ruled as it relates to that portion of the alluvion lying on the outside of the levee and in front of the same property; and after a trial upon the merits, judgment having been rendered in favor of the plaintiffs for the land last described, according to the prayer of the petition, the defendants appealed.
[212] The municipality has not appealed from that part of the judgment sustaining the exception of res judieata, as to that portion of the property in controversy upon which the defendants’ buildings are erected, but they ask a modification of the judgment in that respect. We have therefore first to inquire into the question whether the judgment in the case of- Henderson and others against the mayoz1, aldermen and inhabitants of the city of New Orleans forms a bar to this action, as carrying with it the authority of the thing adjudged between these parties.
A careful examination of the arguments and authorities on this point has failed to satisfy my mind that this exception ought to have been sustained in the court below. It appears to me so dozzbtfzzl that I think the judgment in *493 this particular should not he disturbed, and that the whole case is fairly open before ns on the merits, on the answer to the appeal.
Proceeding, therefore, to examine the ease upon the merits, I begin by assuming as undisputed facts, that the Jesuits’ plantation, of which the lots in rear of the premises in controversy formed a part, was from its local situation, fronting on the Mississippi, and exposed to abrasion by its currents, entitled to any alluvial accretion upon its front, and that such was the condition of things in 1805, when the city of New Orleans was incorporated by an act of the territorial legislature, and the property in question embraced within its limits. That in 1806 or 1801?- a part of the land was laid out as the Faubourg Delord, and lots sold in conformity to the plan. Such being the oase, if the same land or that part of it which still fronts upon the river has ceased to enjoy the same advantage, to the profit of the owners of such front, or has lost the right of accretion, and since that period the alluvion formed belongs not to the owners of the front lots but to the city, such a change — such a dismemberment of the property must have resulted either from the operations of law, or from the consent of the former or the present proprietors. It would seem, therefore, that the inquiry before the court is twofold — -first, into the effect of the act incorporating the city and embracing the property in question, now composing the Faubourgs Delord and Saulet within its limits, and [213] secondly, whether the laying out of the faubourg as shown by the plans and disposing of lots in conformity thereto, or any other acts of Madame Delord or her successors, taken in connection with the various ordinances of the city council, furnish sufficient legal evidence of an intention, on her or their part, to dedicate the property claimed by the plaintiffs to public uses, so as to constitute a locus piibMcus. Under the first head I will consider merely the legal operation of the Act of 1805, wholly independent of the will of the then proprietor, and how far the character of the property was changed thereby from rural to urban, so far as it regards the right to profit afterwards by any alluvial increase; and under the second, I will consider the effect of the same act, together with the several ordinances of the city council, and especially that of 1831, by which a part of the Faubourgs Delord, Saulet and Lacourse were finally incorporated, as it is termed, that is to say, admitted to all the advantages and subjected to all the burdens of the square of the city, taken in connection with the acts and declarations of the parties.
I. If the Act of 1805 which incorporated and defined the limits of the city of New Orleans, embracing a large extent of territory from Lake Pontchartrain to the river and numerous plantations fronting on the Mississippi, and all previously entitled, according to the existing laws, to any alluvion which might he formed upon their front, had declared in explicit terms, that after the passage of that act, the owners of such tracts of land fronting on the river should no longer be entitled to any alluvion which might be formed, but that the same should thereafter accrue to the benefit of the city, there is not perhaps a single mind, capable of discriminating between the legitimate exercise of legislative authority and acts of sheer spoliation, that would not pronounce such an enactment to be without any constitutional validity. Will it he said that the right to future alluvial formations is not a vested right? I answer that *494 such right is inherent in the property itself and forms an essential attribute [214] of it, resulting from natural law in consequence of the local situation of the land, just as much as the natural fruits of a tree belong to the owner of the land; and that such an attempt to transfer from the owner of the land to the city, the future increase by alluvion, would be as legally absurd, as if the legislature had declared, that after the incorporation of the city, the fruits of all the orange-trees within its limits should belong thereafter to the city and not to the owners of the orchards and gardens. If such would be our judgment upon an express enactment, a fortiori, should we declare that such an effect could not follow by mere implication.
But the argument is, as I understand it, that the character of the property was changed from rural to urban by the incorporation of the city; and inasmuch as urban property does not by law enjoy the right of alluvion, as is contended, consequently after that period, the city is entitled to the increase and not the front proprietors.
Admitting for the present, and for the purposes of this argument, that by the-Boman and Spanish laws, the right of alluvion is not enjoyed by urban estates, and that they form an exception to the general rule, yet it appears to me the same difficulty recurs; for if the legislature without my consent places my property in a new category or gives it a new classification, or in consequence of which it is shorn of one of its original attributes, it is not easy to distinguish such an act from one by which the same result is sought to be obtained by direct enactment. It is after all but a circuitous way to the attainment of the same end and is equally repugnant to the first principles of justice and to all constitutional restraint upon the legislative power. This argument presupposes that the original tract was entitled to alluvion, and I now speak only of the effect of the act incbrporating the city and extending its limits so as to embrace the Jesuits’ plantation; without regard to any subsequent acts of the front proprietors, from which an intention 'to dedicate to public uses might be inferred, and it appears to me, that in truth the act of incorporation [215] might be laid entirely out of view and our inquiry confined to the evidence of dedication — on this point, the court I believe is unanimous.
But supposing these principles are questionable, and that I am mistaken in this view of the subject, is it true that urban property fronting on the river is not entitled to alluvion, and that such an exception is recognized by the Boman or the Spanish law? This question leads me briefly to look into the doctrine of alluvion, its foundation and its limitations and exceptions. The doctrine, in my opinion, does not cover a very wide space, and in this discussion, the question as it has been treated, and as I propose to treat it, becomes one rather of language and philology than of law.
The Boman legislator, instead of giving the more exact and scientific de finition of our modern Codes, announces with oracular brevity, a great rule of natural equity: “ Prmterea, quod per alluvionem agro two flumen adjecit jure gentium tibi acquiritur,” which I translate as follows: “moreover, whatever the river has added to your land becomes yours by the law of nature (or nations).” I use the English word land instead oí field, because it appears to me that the word ager in the text is employed in its primitive *495 sense to signify land or soil in the abstract, without regard to any idea of property or to any particular form or size, or shape, pi’ecisely as it is in the Greek, from which it is derived (agbos), and as it is the compounds into which it enters both in Latin and several modem languages, such as “ agricultura, agricola, agrarius, and agrimensor.” It will not be pretended that agriculture is confined in any language to the,culture of afield without a house or other building upon it, as the word ager signified according to Rodrigues and even the Roman Digest. The language itself furnishes internal evidence that such was its primitive meaning, for the earliest as well as the most useful of human arts, that which in a great measure feeds and clothes the great family of man, derives its name from that word in combination with another which signifies to eultmate. Again, alluvion is a right founded on nat- [216] ural law, in which the maxim certainly applies with all its force, that where the reason is the same, the law is the same, and would that law distinguish between two contiguous estates or tracts of land fronting on a watercourse, and equally liable to be wasted by its encroachments, deny to that which should have a building upon it, the natxu-al chances of accretion, while it gives it to the other 1 I think not, any more than agriculture should be taken to mean the tilling of a field on which no edifice exists. That the word ager was sometimes employed to signify something different there is no doubt, and so is land in English; its primitive signification is soil, ground ; but it sometimes means a country or territory, as “ the land of my fathers,” “ the land of ■ Canaan.” This arises from the poverty of human language and the impossibility of having a distinct word to signify every object in nature, and all the infinite varieties and shades of ideas. The Roman language at an early period was as poor as the Roman people. Witness the fragments of the twelve tables which it requires a profound antiquarian to decipher. But it adopted new words, with as much avidity as the Romans accorded to subject tribes the rights of citizenship; and we have the authority of Horace for saying that even in the Augustan age new words were always welcome, provided they flowed from a Grecian source.
“ Efc nova factaque wipes habebunt verba fidem, si, ■Graeco fonte cadant, pareé detorta.”
Hot only the same word came to have different significations, but new and sometimes odd combinations of words were resorted to in order to express new ideas or objects. The word prmdium, for example, about which so much has been said in the course of this argument, is supposed to have been derived from the word prmda, whioh means plunder, because it was originally an allotment of land, the spoils of conquered tribes; as the word plunder among a certain class of our citizens, is used to signify the scanty chattels of the pooi\
Much stress is laid upon the definition of ager, in the Partidas, (law [217] 8, tit. 33, par. 7), to prove that it was only fields without buildings on them, which enjoyed by the Roman law the right of alluvion. It is true the Partidas says it means in Latin “ como campo para sembrar en que no ha casa ni *496 otro edeficio, fueras ende alguna oabaña 6 olioga para cobrar los frutos.” Tlie authority of even Alphonso the wise, to fix by statute the meaning of a Latin word may well be questioned. That it did not always bear that narrow meaning, and sometimes signified land or soil in general, is manifest from the usage of the best authors. Virgil, for example, speaks of Sichaeus, the first husband of Dido, as “ ditissimus agri Phoenicum ” — meaning, as I understand it, the richest of the Phoenicians in land — and afterwards of Oamertes, as the richest of the Ausonians in the same species of property. It is probable each had something more than a field without a house — HSneas was promised in his future empire “ a rich exuberance of soil — divitis uber agri." In the first book of the Georgies we find within the compass of a few lines the words tellus, arman, ager, terra and eampus used, as nearly synonymous. But in the following lines I think the word ager is most manifestly used as contradistinguished from arm, which we all know means fields ; the soil is represented-as parched with heat, while little streams are conducted so as to irrigate the fields ; so that ager implies more than one field.
“ Et cum exnstus ager morientibus ©stuat berbis, Ecce supercilio clivosi tramitis nuclam Elicit: illa cadens raucum per levia murmur Saxa ciefc, scatebrisque arientia temperat arva.'n
But without relying too much upon the authority of the poets, we have that of Niebuhr, one of the most profound scholars and acute philologists of modem times, and who had made the agrarian institutions of Borne the subject of long and laborious investigation. This authority, I venture to say, is worth all the lexicographers, whose works have been consulted and referred to- iu argument. In an appendix to his second volume of the history of Borne, [218] he gives us much information concerning the Roman mode of partitioning landed property, the limitatio or survey, and the peculiar terms of the ancient national law. He says, “ ager, a district, was the whole territory belonging to any civil community, in opposition to terra, a country, which comprised many such proprietary districts; as for instance, terra Italia Qrmeia. All landed property (ager in its restricted sense), was either Roman or foreign —“ aut Romanus aut peregrinus.” All Roman land was either the property of the state (common land, domain) or private property — “ aut publieus aut privatus.” The public domain is always called ager publieus, there was also ager veetígalis, and ager munieipalis according to the same author, and mentioned in the Pandeets.
But the text of the Pandects shows that the word ager, in reference to this subject of alluvion, was used indiscriminately 'with fundus and preedium. In three successive paragraphs these words are thus used:
1. Prseterea quod per alluvionem agro nostro Tinmen adjecit jure gentium nobis acquiritur.
2. Si vis fluminis partem aliquam ex tuo prmdio detraxerit et meo pmdio attulerit, halara est earn tuam permanere.
8. Plané si longiore tempore fundo meo híeserit arboresque quas secum *497 traxérit mfundum, meum radiéis egerit: in eo tempore viditur meo fundo acquisita esse.
It. will hardly be contended that in these three paragraphs the three different words employed imply as many different kinds of estates. Indeed, throughout the whole remainder of the first title of the 41st book of the Pandects, which treats of islands formed of the beds of rivers becoming dry in consequence of a change of course, and returning again to .the same channel, the words ager, ¡¡radium and fundus, are used indiscriminately, indicating rather a difference of style among the different jurisconsults who contribute to that great work, than any essential difference of landed property upon the margin of the streams. In no part of it do I find any exception to the right of alluvion, unless it be that established by the law in agris [219] Kmitatis, of which I shall have occasion to speak presently. It is essential that the land should be bounded on one side by a watercourse, but it would seem to have been immaterial by what name the riparian estate was called.
Cities may acquire jure alluvionis, it is contended. This I do not doubt, but then it must be as proprietor of the front or as riparian proprietor. It would be absurd to say it could be otherwise, for that is of the very essence of the right, the alluvion is but accessory, the front tract is the principal— the former cannot exist without the latter.'
But to return to the law in agris Kmitatis which is greatly relied upon to show that cities may acquire jwre alluvionis in some manner not easily understood. Such a construction of that law is apparently countenanced by what fell from the court in the case of Packwood v. Walden, 7 Martin, N. S. 9, in which it was said, “ according to the law of the Boman Digest in agris Kmitatis ; although the right of alluvion is denied to fields of that description, yet it is granted to land on which a, city is founded.” I think this an error arising from a hasty consideration of that law, and a translation manifestly erroneous. The text is as follows: “ In agris limitatis, jus alluvionis locum non habere constat; idque et Divus Pius constituit. Et Trebatius ait, agrum qui hostibus devietis e& conditione eoncessus sit ut in civitatem venvret habere alluvionem ñeque esse limitatum. Agrum autem manucaptum limitatum fuisse ut scieretur quid cuique datum esset, quid venisset, quid in publico relictum esset.”
The translation of this law as given by the senior counsel of the plaintiffs is as follows-: “ It is certain that the right of alluvion does not take place in limited fields. This has been decided by a constitution of the Emperor Antoninus ; and Trebatius says that land taken from a, conquered enemy and conceded under condition of belonging to a city enjoys the right of alluvion, and is not considered as limited, &o.”
This translation is certainly justified by that of Hulot into French, who appears to consider the expression “ eá conditione eoncessus sit ut in [220] civitatem veniret,” as expressing a grant to a city of land taken from the enemy. But such a construction is in my opinion, contrary to the idiom of the language, as well as irreconcilable with the history of the times, to which it refers. If it had been the intention to express a concession to a city, the *498 word, expressing the grantee would have been in the dative, civitati, perhaps more properly, urbi. If, as is supposed by the plaintiffs’ counsel, the city is. the grantee, the words ea conditione are not only surplusage, but they make nonsense of the passage. Does the grantor make a condition with the grantee, that the thing given shall belong to the latter ? If A gives to B a tract of land, it belongs to the donee without any such condition. There can be no condition in such a case; with whom would it be stipulated ? "With the grantee? Then you would do so vain a thing as to make the grantee or donee consent to a condition, that the thing should belong to himself, which is already his by the donation or grant. If, on the other hand, we suppose the grantee to be understood, indefinite, or not named with a condition that the land should belong to a city, no reason can be imagined, why a nominal grantee should be interposed, when the grant is to take effect in favor of a city. On the contrary, in my opinion, the words “ ut in cimtatem veniret,” establishes a condition of reversion to the republic, whether we consider the concession as meant in favor of the conquered enemy, by leaving them in possession, subject to the will of the State, and deviotis hostibus in a dative, or to an indefinite grantee under the same condition of reversion, and the same words in the ablative, merely expressive of the fact that the land had been taken from a conquered enemy. De Bréau Neuville, the learned translator of Pothier’s Pandects, considers the sense of the passage to be, that lands given back to the conquered enemy on condition of reverting to the republic, enjoy the right of alluvion, and are not limited. Such a translation accords also with the practice of the republic at that remote [221] period. Pothier, in a note to this law and its context, remarks, that when lands were taken from an enemy, the possessors of such lots, when passing under the domination of Borne, were sometimes permitted to retain ;a part; another part was distributed to the veterans, and another part was «old, deducting that which was left to the ancient proprietor; but every part -of those lands thus distributed were measured and bounded, and hence were •called limitati.
But the most satisfactory authority upon this as well as other points of the 'Boman land law, is Niebuhr. In speaking of the Limitatis, this author says, •“ according to the agrarian institutions no land was held to be marked by '■boundaries, save what had been divided in conformity to the practice of the State, and to that mode of observing the heavens which was adopted in taking auspices. Every other kind of boundary was regarded by the Bomans as 'indefinite. The subject treated of by the Agrimensores, is land thus marked • out: other land they only mention by way of contrast. Every field which the republic separated from the common domain, was marked out by boun•daries: no separation could take place without such a demarkation; and 'whenever there were any traces of the latter, although particular estates ■within the region subjected to it might still be a part of the domain, it was ■yet a certain proof that such a separation had taken place. On the other 'hand every municipal as well as every foreign region was held to be without ¡boundaries (areifimous)yOr merelylimited by natural or arbitrary landmarks.” ' “ The land which .was regularly limited and that which was indeterminate in *499 form along with all the other characteristics of Quiritary property, had both of them that of being free from direct taxes, but their value was registered in the census and tribute was levied accordingly. In other respects the limited fields had certain legal peculiarities, concerning which, scarcely any other express statement is preserved, than that they had no right to alluvial land, the determinateness of their size being the condition of their existence.” History of Rome, vol. II. appendix I. By Niebuhr.
The same author further demonstrates that the limites which sepa- [222] rated these agri limitati were not imaginary lines and stakes or landmarks, but spaces of different widths, according to the size of the squares, left for ever open and public as highways. They were marked out according to a system, of which the author gives the general outlines in the following words: “ The principle of the Roman li/mitatio was to draw lines towards the four quarters of the heavens, parallel and crosswise, in order to effect a uniform division of the lots of land which were transferred from the public domain to private property, and to fix immutable boundaries for them. Hence these boundaries (the limites) were marked by a slip of land left for the purpose, untouched by cultivation, as balks or ways; as their extremities were by a row of stones inscribed with numerals.” Ibid.
Such appears to have been the ancient law, not as introduced or first established, hut rather confirmed at a later period by a constitution of Antoninus Pius; for Trebatius, whose opinion is given, was himself a contemporary of Oicero.
There is a further passage in Niebuhr which tends to illustrate the clause l-utin civitaem venir etf which I cannot forbear to quote. “There was,” says he, “ a by-class in the Roman system, when the republic restored a conquered territory to its old inhabitants, subject to the payment of a tithe or some similar tax; this, as long as the precarious possession lasted, was like any other impost, hut the republic had the right of claiming the land and turning out the possessors.”
After the most attentive consideration of this part of the case it appears to me there is nothing in the Roman law which provided that the right of alluvion was restricted to laud or portions of land bearing particular names or having particular localities, but the right depended altogether upon the question whether the tract had fixed and invariable limits or a natural boundary on one side at least, liable to be affected by a watercourse — no matter whether it bore the name of ager, prasdium or fundus, nor do I find that cities formed any exception to the general rule.
But the counsel for the plaintiffs endeavor to fortify their position [228] by the aid of law 26, title 28, Partidas, 3d. It is in the following words :
“ Orecen los rios a las vegadas de manera que fuellen e menguan a algunos en las heredades que han en las riberas dellos e dan, e crecen a los otros que las han de la otra parte. E porende decimos, que todo quanto los rios fuellen a los homes poco a poco, de manera que non pueden entender la quantidad della porque no lo llevan ayuntadamente, quo lo gañan los señores de aquellas heredades, á quien lo ayuntan, e los otros a quien lo tuellen non han en ello que ver. Mas quando acaeciesse, que el rio llevase de una heredad ayuntada *500 mente, asi como alguna parte della con sus arboles, ó sin ellos, lo que asi llevase non gañan el señorío dello aquellos á cuya heredad se ayunta; fueras ende, si estuviesse y por tanto tiempo que raigassen los arboles en las heredades de aquellos a quien se ayuntasen; ca estonce ganaría el señorio dellos eldueño de la heredad do raigasen, pero seria tonudo de dar al otro el mercoscabo que recibió porende, según el aluedrio de homes buenos, et sabidores de lauores de tierra.”
This law is nearly a paraphrase of the Roman law prmterea and the following in which the words ager, fundus aud prsedium are used without distinction. The word heredad is used in the Spanish text to express the riparian property or land entitled to alluvion, and the counsel contends it must bear the same narrow meaning which they give to ager, to wit, a field without a house. Heredad, in Spanish, I understand to mean a landed estate, and the text might well be translated by using that English word corresponding to the Erench word heritage. Thus the word conveys the same idea expressed in the original law of the Digest by the words ager, fundus and prasdiwm, I say the original, because the wisdom of Alphonso was after all in a great measure but reflected light, whose source was the Roman law, and which was sometimes not a little refracted by passing through a Gothic medium.
[22T] The plaintiffs next invoke the 9th law of the same title of the 3d Partidas, as giving in express terms to towns and cities the alluvion which is formed in front of cities. The law is as follows:
“ Apartadamente son del común de cada una ciudad ó villa, las fuentes © las plazas o fazen las ferias é los mercados a los lagares 6 se ayuntan a consijo é los arenales que son en las riberas do los ríos e los otros exidos e las carreras á corren los caballos, e los montes e las ochesas e todos los otros .lagares semejantes d’estos, que son establecidos é otorzados para pro comunal de cada ciudad, <fec.”
The counsel for the plaintiffs confidently assert that this law is olear and explicit in its terms and decisive of this controversy. The word arenales they contend means alluvion, and in this they are in some measure countenanced by what fell from this court arguendo in the case of Packwood v. Walden, 7 Martin, N. S. 90. But does the word arenales necessarily mean alluvion ? Certainly not, nor can I see any good reason for considering it as used in that sense in this law. Hone of the definitions of avenal to which our attention has been called in various dictionaries, conveys any such, idea as alluvion, that is to say that portion of soil which is insensibly (poco a poco in the language of the Partidas) added to and becomes a part of land bordering upon a watercourse; and the only comment of Gregorio Lopez upon the word is a qumre, “ quid de fluminibus ? ” as if he considered the arenales “ en las riberas do los rios,” as forming a part of the bank itself of the river, and consequently its use already belonging to the public by a previous law of the Partidas and now given to towns in front of which they exist, and he suggests the inquiry whether the use of the rivers also be given to the city as well as the bank.
If it had been the intention of the lawgiver to create an exception to the general rule, as recognized in the Partidas, that the alluvion belongs to the *501 owner of the riparian estate or heredad, such an exception would naturally have found its place in immediate connection with the general law. Again, why treat of the accessory, without any allusion to the principal? I [225] am rather inclined to think it means only the sandy beach common on shallow rivers, which are any thing rather than alluvion formations, and which the inhabitants of cities or towns are authorized to use in common for their domestic or perhaps agricultural purposes, or for public promenades, as the Arenal of Murcia on the river Segura. Mrs. Gushing’s Letters, vol. 2, 34.2. Be that as it may, it appears to me clear, that all the objects enumerated in the law are connected together and are referred to by the words establecidos y ortogados ; and if the threshing and grazing grounds and other conveniences mentioned in the law, rest upon a grant to the town, the arenales are in the same category, and according to my understanding of the law, it is only an enumeration of those things which are usually given or reserved by the sovereign for the use of towns or cities laid out by royal authority, or which they hold by usage or by concession. In that sense substantially, Gregorio Lopez appears to have understood it. “ Prseterea quod hie dicatur (que son establecidos) non intelligitur, quod a jure sunt statuti pro civibus; quia civitati vel castro de jure nihil corporale est deputatum, quod sit de ejus pertinencia; nisi quatenus a lege aut consuetudine aut hominum dispositione riperiatur concessum.” Mote 6.
But the counsel for the municipality contends that the corporation is in a certain' sense riparian proprietor, and therefore entitled to the increase by alluvion on the front. I cannot do justice to this part of the argument without quoting the language of the senior counsel, in which he developes his views on this point.
“To any person,” says the counsel, “who has studied the Civil Law of Louisiana and knows the source from whence this text is drawn (art. 501, La. Oode) as well as the legal acceptation of the term 1 fonds rive-rain'' (riparious estate), this text is sufficient to form a decision on the conflicting claims of the city and private individuals — owners of lots which are only portions of the estate {fonds) upon which the city is founded {fondée). ■
“ He will entertain no doubt that the city and not the owners of [226] these lots is the riparian proprietor.” Page 121.
“ To build a city,” continues the counsel, “ town, or village, it is necessary, I conceive, to have first the ground (fonds). This (the fundus) being had, the town is built upon it. Thus built the town becomes inhabited, and the inhabitants, for the purpose of ingress and egress to and from their houses, &c., and for access to the river upon the borders of which it is situated, for returning therefrom, and for that of travelling over the whole front of the town, if their business requires it, have streets, roads, issues and avenues, which are no more than parts of the ground, foundation (fonds) upon which the town is seated. }
“What is the nature of this property (fonds) now? Is it not an urban property?
“ To whom does it belong? Mecessarily to the community called a city *502 to that aggregation of persons who inhabit it. Each of them is proprietor of the lot on which his house is situated, and all possess in common the streets, roads, issues, and avenues, to the use of which every stranger, whose affairs lead him to the town, is in like manner entitled.”
He then supposes the prince or the individual who should have founded a city would no longer be regarded as proprietor, and could no more sell the soil upon which the city is built than he could the inhabitants; that he no longer remains master of the ground (fonds) upon which the town is built.
“ We must therefore conclude,” says the counsel, “ that the ground (fonds) which was rural and by its conversion into a city has become urban, no longer does or can belong to its ancient master; that it is and can only be the property of the public — of that aggregation of inhabitants, who by the fact aloiie of the roads, streets, issues and avenues being destined to their common use form one community.”
It is not easy to conceive how the city in the case thus supposed, in its corporate capacity, becomes proprietor of the port in such a sense as to profit [227] by the alluvion. Take the square of the city, for example, which was laid out by the sovereign. The original plan exhibits a front row of houses— next, a vacant space marked quai, then the levee and the river. The front lots belong to individuals and are bounded in front by a locus publicus, the quai. In what sense is the corporation a front proprietor, even admitting that the owners of the lots fronting the quai are not so ? I admit that if a batture should be formed in front of the square of the city, it would be an addition to a locus publicus, but that does not prove what is contended for, because the city is not proprietor of .the locus publicus, but only administrator. It belongs as much to a citizen of Ohio as to a citizen of New Orleans. It is a place left open for the convenience of commerce, and for the use of the whole world — a thing hors de commerce.
But so far as the case supposed is meant to apply to the locus in quo, it assumes as true what is yet to be shown, to wit: that the lots in front are not bounded by the river, that they are not liable to abrasion by the river to the loss of the owners; and that the proprietors would not be bound to give a new levee or a new road,-in the event of the existing one being carried away. These are questions which we are to examine in this case, and therefore we cannot begin by assuming that the corporation is the riparian proprietor. It is certain that the Jesuits’ plantation was originally entitled to the alluvion, and I am now only arguing what change was produced by the mere incorporation of the city in 1805. The question of dedication yet remains to be investigated — for the present it is enough to say that in my opinion the change of the name of the property from rural to urban, by the mere act of incorporation, neither made the city a front proprietor in the sense contended for by the plaintiffs, so as to enable it to acquire jure allwoionis, nor did it per se deprive the front lots into which the property was subdivided (provided they fronted on the river,) of the right of such accretion.
The counsel for the plaintiffs endeavor to fortify the claim of the city to [228] the alluvion by showing that the charge of keeping up the levee is borne *503 by tbe whole city and not by the front proprietors, and that, therefore, the former ought to enjoy all the advantages resulting from the situation of the land — upon the maxim, “ qui sentit onus, sentire debit et commodum.” That this axiom of equity lies at the foundation of the right of alluvion may be true — it is but just that the risk and loss resulting from the situation of the land should be compensated by the chances of increase by alluvion. But the onus or burden spoken of is natural not civil. It is a risk arising from the exposed situation of the land, not the expense or trouble of making embankments to save the land or adjacent tracts from inundation. The right of alluvion exists on streams which do not periodically overflow, as well as others which do, and those police regulations which relate to the making and keeping up of levees have nothing to do, in my opinion, with the question of alluvion.
The arguments of the counsel drawn from the supposed inconvenience of having a port or any part of its bank owned by individuals, and the danger of the public being excluded from the use of it to the great detriment of commerce, would be entitled to serious consideration, if it wero not true at the same time, that the public, through the agency of the corporation, has the sole use of the levee and of the bank of the river. That the front proprietors cannot extend the levee without the consent of the corporation, and that the city authorities have a right to make all improvements for rendering the whole most useful to the public and favorable to commerce. So far as it concerns the public convenience it seems to be of little importance whether the future increase of the batture shall be decided to belong to the public or to the front proprietors so long as the municipal authorities alone have the entire control of every thing on the outside of the levee and have a right to establish wharves and'other conveniences which commerce may require. In most of the sea-ports of the Union it is believed the wharves are private property. Here they will be public, whoever may be considered the owner of the bank of the river, subject to the public use. The Louisiana Oode [229] is explicit on this point: “ The use of the banks of navigable rivers or streams is public, &c., nevertheless the property of the river banks belongs to those who possess the adjacent lands.” “ On the borders of the Mississippi where there are levees, the levees shall form the banks.” Arts. 446, 448.
It is not pretended that the question which this part of the case presents, has ever been directly adjudicated upon by this court; but it is supposed by the plaintiffs’ counsel, as well as the parish judge, that the court has on more than one occasion given a strong intimation, that in their opinion, the alluvion formed since 1805, belonged to the city in virtue of the act of incorporation, and .especially in the Case of Cochran v. Fort et al. 7 Martin, N. S. 622. In that case the plaintiff claimed a city lot fronting on the river, and the alluvion which had formed upon it since his purchase. The question presented was mainly one of fact, to wit, whether the batture in front of the lot was or was not at the date of the purchase susceptible of private ownership. If so, then it could not be presumed that the vendor of the plaintiff intended to sell it, and the only principle settled in that case was, that the sale of a lot, front to the river, according to a plan which shows the front line to be within *504 the levee, does not carry with it alluvion, provided, at the time of the sale, a hatture was formed of sufficient height and magnitude to be susceptible of private ownership. The converse of the proposition, it would seem, ought to be tried also, to wit, that the sale of a city lot fronting on the river, would carry the alluvion which had formed since the sale. The only difficulty in the case was to ascertain the mere matter of fact, to wit, did the hatture in front exist or not at the time of the sale? The court decided in the affirmative, and consequently the plaintiff failed in his action. After deciding the matter of fact decisive of the case, to wit, that in February, 1803, a batture did exist which, with a five feet levee, might have been used as private property, the judge, who acted as the organ of the court, made the remark upon [230] which so much stress has been laid, to wit, “ supposing this view of the subject incorrect, and that we were to conclude with the plaintiffs that no hatture susceptible of ownership existed in February, 1803, their case would not be much stronger. The faubourg was incorporated two years after. To enable them, therefore, to recover in this action, they must show a batture created between the day of then- purchase and the date of the act of incorporation, which was susceptible of ownership ; for if the alluvion was formed afterwards, it became the property of the city, and not of the front proprietors.” Certainly, the decision of that case did not require such a remark. It was purely speculative, and although it may perhaps express the opinion of that able judge at the time, yet it does not appear to have been a point discussed during the argument, nor at all material in the case. The question now presents itself directly before us between the city and the owners of front lots in relation to alluvion, formed since the act of incorporation, and I am of opinion that the mere act of incorporation did not change the character of the property, and gives no new title to the city. On this point, I believe, we ax-e unanimous.
The words used by me, as the organ of the court, in the case of the Municipality No. 1 v. Municipality No. 2, 12 La. Rep. 49, have been also alluded to as indicating a strong opinion the other way. The expressions were, “ The pretensions of the defendants as set up in their answer to the exclusive ownership of the property in question, and those of the plaintiffs, <&c., to take one hundred thousand cubic yards of sand from the batture ad libitum, &c., are, in our opinion, equally unfounded and preposterous.” In that case there was an express dedication to public uses of the alluvion in front of the suburb St. Mary by a formal contract between the city and the front proprietors, and the Act of 1836 refers to and sanctions that compromise; and expressly provides that “ the municipality of the upper section of the city of New Orleans shall not m any manner obstruct or ixnpede the inhabitants of any portion of [231] the city, in the free use and enjoyment of any of their rights on the batture.” With such a legislative injunction, how could the municipality with any propriety or consistency pretend to be the exclusive owners of a locus publicus, which it was their duty to administer according to its destination ? But that case and the present have not the most remote analogy to each other.
II. I now enter upon the second branch of this inquiry, to wit, whether *505 the laying out of the faubourg, as shown by the plans, and disposing of lots in conformity thereto, or any other acts of Madame Delord, or her successors, taken in connection with the various ordinances of the city council, furnish sufficient legal evidence of an intention on her or their part to dedicate the property in question to public uses, so as to constitute a loam publicus. The petition alleges, that, by reason o'f the incorporation with the said city, and the laying out and dividing the land, of which the faubourg is composed, into town lots, streets, &c., as a part of said city, the title to all of the said batture or alluvion, then so imperfectly formed, or thereafter to be formed, became by lam vested in the corporation of said city, for public uses. It is not distinctly alleged, that there ever was a dedication to public uses, in a legal sense of the word, resting essentially upon the express will of the dedicator, and assented to by the public, evidenced by the public use of it, according to the dedication. But the idea is, if I understand it, that the annexation to the city successively of the different faubourgs, formed but a continuation of the square of the city, and imprinted upon the land in front of the street or road nearest the levee, the same character which the corresponding part of the squares of the city possesses, that of a quai. This system is developed with ingenuity and learning, in a pamphlet which has been furnished us as a part of the argument in the case, but the author’s name is unknown to us. He considers the quai, marked upon the original plan of the city, as belonging to the city, and not as a locus publicus. It is of no consequence in the present case, whether the original quad, as designated on the plan made by the Drench authorities of Louisiana, be regarded in that light as granted to the [282] city, or as a public place. The question is, admitting the old city to be, in that sense of the word, the riparian proprietor, and entitled to any alluvion which might be formed in front of it, whether it results from the plans of the different faubourgs, that all the land between the front row of houses and the levee partook of the same character with that in front of the old city, and that the city was, as relates to the land in front of the faubourgs, also entitled to the alluvial increase ; or, in other words, that there was a continuation of the quai through the different incorporated faubourgs. The author, above alluded to, treats the old city as the nucleus, around which the faubourgs have gradually clustered, and stand in relation to it as children towards a parent, or perhaps more properly, as partners and associates.
It seems to me clear, that the right to alluvion in front of each faubourg must stand upon its own peculiar grounds, that there is not necessarily any connection between them. The square of the city was laid out and founded by the sovereign. The faubourgs were laid out by the proprietors of different estates in the vicinity, each having a right to alluvion, and the question, what was the condition of the front afterwards, would depend not upon a general conformity of the streets and avenues to those of the square of the city, but upon the disposition made of it by the former proprietor. The Drench authorities of Louisiana indicated an intention to devote to public uses, to consecrate as a locus publicus, all the vacant space between the first row of houses and the river, by writing the word quai upon various parts of the plan, and by leaving it open for public use. If, in laying out the fau *506 bourgs, the ancient proprietors of those riparian estates did the same thing, or what was equivalent, then there is no doubt it amounted to a dedication, if accepted by the public. The present inquiry is confined to the Taubourg Delord, and to the plan of it made by Madame Delord; for with respect to the Taubourg St. Mary, it was long since settled, that the alluvion belonged to the front proprietors, and it has Subsequently been dedicated to public uses by a compromise between them and the city.
[233] It may not be amiss, however, to refer to what the court said in the case of Morgan v. Livingston, with respect to the effect of the plan of a faubourg made by Gravier, and the condition of the property after its division into lots. “ On the morning of the day,” says the court, “ on which Bertrand Gravier sent for a surveyor, to make a plan of his plantation into lots and streets, the land covered by it was rural property, burdened with riparious duties in his hands, and when the plan was finished by the division into lots and streets, no alteration was wrought in these burdens. When nine months after Poeyfarre purchased the trapezium, he purchased a rural estate, burdened with riparious duties, having the portion of the bank of the river before it as an accessory. The sale discharged the vendor from, and imposed on the vendee, the duties of repairing the road and levee along the land conveyed. If any part of this portion of the road had been found out of repair, the syndic of the district would have compelled the vendee to repair it, without the least inquiry into the circumstance, whether his deed bounded him on the road, or on the river ; if he was really the owner of the land, and separated from the river by the road only. The banks of the river opposite to the trapezium, passing to the vendee cum onere, must have passed oum corny modo. “ Had every lot in the faubourg been sold, the liability of the land which they covered, would have continued the same,” &c.
The member of the Louisiana bar,” whose argument has been mentioned, undertakes to maintain two propositions. Tirst, that the city of New Orleans acquired, at the time of the union of the suburb Delord with the city, all the riparious rights which Madame Delord possessed by virtue of a valid contract, and for a valuable consideration. And secondly, that Madame Delord has never disposed of any portion of her riparious rights in favor of the defendants. The record does not furnish us with any evidence of any such express contract, as is supposed. In 1805, the plantation which after-wards became the Taubourg Delord, formed an integral part of the city by [234] the act of incorporation. After it was laid out as a faubourg, it remained for many years what was termed one of the unincorporated boroughs, or suburbs of the city; that is to say, not yet entitled to participate with the square of the city in the advantage of being lighted and guarded at the common expense. This last step was not taken until 1831, when, by an ordinance of the city council, a part of the Taubourgs Delord, Soulet, and La-course, between the upper line of the Taubourg St. Mary, and the centre of Lacourse-street, was incorporated, and required to pay the same taxes, and authorized to enjoy the same rights and privileges as the inhabitants of the square of the city. Ordinance of April 8, 1831, Oity Laws, 63. Hp to that period, I have seen no sanction by the city authorities of the plan of a fau *507 bourg adopted by Madame Delord, much less any contract by which sho abandoned the front of her land to the city. Indeed, the uniform legislation of the city council, from that time until the inception of this suit, repels such an idea. In 1817, an ordinance was passed concerning the unincorporated boroughs and suburbs within the city of Mew Orleans, which provided, among other things, that “ the levees adjoining the estates bordering on the river, situate in front of unincorporated boroughs or suburbs, which have hitherto been kept in repair at the charge of the proprietors, whose lands are bounded by the river, whether by a particular clause stipulated between the vendor and the purchaser, or of an obligation anterior to the settlement of said boroughs or suburbs, shall continue to be kept in repair at the expense of the said proprietors, in the manner prescribed by the ordinance concerning highways, bridges, and levees within the liberties of Mew Orleans.” The ordinance last referred to was passed in 1815, and requires the front proprietors to keep up the levee. The ordinance of 1830, the execution of which led to the suit between the city and Henderson and others, treated those who held lots under Madame Delord as front proprietors. It directed a new levee to be laid off by the city surveyor, commencing at the lower line of the Faubourg Delord, and running parallel with Mew Levee-street to Roffignac-street, and then to the upper line of Mr. Byrne’s property. It directs the pro- [235] prietors to be notified, and requires them to complete and deliver said levee on the first day of Movember, and it was made the duty of the mayor to notify the front proprietors of lots in the faubourgs Delord and Saulet, and it further directs the work to be done at their expense in case of contravention, besides a penalty of one hundred dollars. A new road and levee were directed to be laid off in advance of the former ones; and the questions which arose in the case of Henderson & al. v. The Mayor, Aldermen, and Inhabitants, presupposed the plaintiffs to be, in point of fact, riparian proprietors, for they related to the obligation of the latter to furnish a new road, and to make and keep up the new levee.
But if on the part of the city authorities every official act which has been brought to our notice, tends to show that the city did not understand there was a dedication, resulting from Madame Delord’s plan of a faubourg, which constituted the city the riparian owner, as is now pretended, how do the subsequent acts of Madame Delord and her successors accord with the theory of a dedication to public use ? On the 26th of May, 1806, she sells to Larche three lots on the batture, according to the plan of Lafon, of the 21st March of the same year, the purchaser taking upon himself the burden of making and keeping in repair the road and levee in front of said lots. On the 6th of June, 1807, she sells to Armand Duplantier her plantation of about seven arpents, fronting partly on the river, and partly on the great route of Tchoupitoulas, and among other title papers handed over, appears a plan of the plantation by Lafon, of the 6th February, 1806. Mone of the plans in the record contain any indication of the front having been dedicated to public use, and her contract with Larche and with Duplantier shows that she did not so understand it. She continued to exercise acts of ownership as a riparian proprietor, not only without opposition on the part of *508 the city, but the last ordinance of 1830 by the city authorities, acting as a police jury, and laying out a new road and levee, imposes upon her succes[236] sors, as riparian proprietors, the burden of keeping up the levee along their front.
Lafon’s plan of the 6th of February, 1806, is now before me. It exhibits the side lines of the plantation of Madame Delord, which separates it below from the faubourg St. Mary, and above from that of Soulet, as running diagonally down to the water’s edge. The front lots are represented as bounded on New Levee-street, and the levee is marked along the side of the street, and between it and the river, at a distance of about fifteen toises from it. There is no mark indicating any intention on the part of Madame Delord, to give up her claim or title to the land forming the levee and on the outside of it. Since the date of that plan, the land upon which the cotton press stands, has been formed, and the levee and public road, laid out by order of the city council in 1831, are about two hundred feet outside of New Levee-street; and all the land between New Levee-street and the new road and levee belongs, according to the judgment rendered in this case, to the front proprietors. The intervention of a public road between the front tract and the river does not prevent accretion by alluvion, because the road and the levee themselves belong to the front proprietors, subject to the public use. 6 Mart. Reports, 230; Sirey for 1822, part 2, p. 191.
It is true the public has always possessed and used the levee and the ground between it and the water’s edge; and if the city authorities, under whose administration such a right has been enjoyed, had no other title but that which would result from the presumed consent of the front proprietors, such enjoyment in the presence of the latter might tend to show an acceptance on the part of the public of a dedication to public uses. But the law itself gives to the public a right to such enjoyment independently of the consent of the front proprietor, and such use is not legally inconsistent with the ownership by the riparian proprietor. Nothing therefore can be inferred from the public use of the bank of the river and the land on the outside of the levee, and the batture as fast as it forms. The city authorities [237] have the exclusive control of the levee and the banks of the river as a part of the port of New Orleans.
The principles which govern in cases of dedication to public uses are considered as-'weE settled. They were recognized by the supreme court of the United States in the case of The City of Cincinnati v. White’s Lessee, 6 Peters’ Reports, and were assumed by the present senior judge of this court as the basis of his opinion in the case of De Armas & al. v. The city of New Orleans, 5 La. Reports, 148. “ The law applies to it ” (a dedication) says the court, “ those rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor and to secure to the public the benefit held out and expected to be derived from and enjoyed by the dedication. That there was no particular form or ceremony necessary in the dedication of land to public uses, and that all that was required was the assent of the owner of the land, and the fact of its being used for the public purposes intended by the dedication.” Tested by these principles I can *509 not find, in the case now before us, any evidence of an intention on the part of Madame Delord or her successors to dedicate the front of her or their land to the public use.
But the principle that the intervention of a public road does not cut off the right of alluvion, or in other words, that a tract of land separated from the river by a public road is still considered as fronting on the river-, and a riparian estate, has been contested in this case on the ground that the land over which the road runs was paid for by the city in pursuance of the judgment of this court in the case of Henderson & al. v. The City, and that consequently the city became the absolute proprietor of the road and levee, and front owner. Even supposing this to he true, which I am not disposed to admit, and that the road opened under the ordinance of 1831, became by the judg'ment of the court the absolute and irrevocable property of the city, still it is nothing more than a public road, via pub Kca. This court in the ease of Morgan v. Livingston, decided in the most explicit manner this question. The language of the court in that case leaves no doubt upon that point, supported as the principle is by unquestionable authority. The very point [238] now urged was considered and overruled. The court says :
“ The bank passes with the field even when there is cm intervening public road. Ripa cedit fundo, 1. Riparum, ff. rer. divis. Inst. eod. tit. Dicit verum si via est media. Ripse, respecta proprietatis sunt illorum, quorum prasdiis hmrent, sed quid si via esset in medio, interflumen et agrum vel domum ? Responde idem ut Ripee sunt eorum. Ompola, &c.
“ If there be a public road between a field and the river, still that which is made by alluvion accrues to the field. Si meum inter agrum et fluvium interjaceat publica via tamen meum fieri quod alluvio adjicit. Grotius, &c. Gronovii, nota 68.
“ But the defendant’s counsel urges that this must he understood of a private road, one of which the soil belongs to the owner of the field, and is burdened with a right of way, and he refers us to the law, Atticus, ff. 41, 1, 38, and to Grotius, who holds there is no principle of natural law which justifies the position that the owners of estates, separated by a public road from the ■river, have a right to alluvion, and admits that the field has the alluvion, if it he a private one, which owes a road — qui viam debeat; Grotius, &c. &o., — so that the soil of the road be the property of the riparious owner.
“ The expression used by the writers whom Grotius c.ondemns, is via publica, a public road.
“ A public road is that of which even the soil is public ; it is not in a public road as in a private road, the soil of which does not belong to the public, while we have only the right of walking and driving over it; the soil of a public road is public. Viam publicara earn dicimus cujus etiam solum publicum est, non sicuti in private via ita esse in publica accipimus; vies privates solum alienum est. Jus tantum eundi et agendi nobis competit; vise autem publicee, sohim publiewm, est. ff. 43, 8, 2, sect. 21.
“ We conclude that in the present case the intervention of the public road between the trapezium and the river, cannot be considered as a proof [239] *510 of the intention of the parties to give the land conveyed another boundary than the river.”
I have copied this part of the opinion of the court in the case of Morgan v. Livingston, not only because it is the language of the court, expressing its deliberate judgment upon a leading point in the case, which point is again made in the case now before us, but because it was written by the present senior judge, then the organ of the court, in pronouncing its decision.
There is a striking resemblance between this case and that above alluded to, decided by the dour Royale of Lyon and reported in Sirey for 1829, 2d part. In that case the Commune of Roques insisted that the property of the defendants was separated from the Garonne by a public road (ohemin communal), and consequently the alluvial increase could not attach to it, although it might be otherwise if separated only by the towpath (chemin de halage) because the latter is but a servitude imposed upon the riparian property. But the court held otherwise, and relying upon the same authorities from the Roman Digest and Institutes which are quoted in the case of Morgan v. Livingston, decided that a public road does not legally interrupt the adhesion between the front lands and the river, which it separates, because the road makes a part of the land itself, if not quoad proprietatem, at least quoad commodum et incommodum.
This argument is based upon the supposition that the new road in front of the cotton press, laid out under the ordinance of 1831, belongs to the municipality in full property, or is a public road, and has been purchased from the front proprietors in pursuance of the judgment in the case of Henderson et al. v. The City. But there is no evidence in the record that such is the case. That judgment proceeds upon the ground that the land over which the new road was laid out belonged to the front proprietors. The city was enjoined from proceeding to open the road without paying an indemnity to the front proprietors, and the injunction was maintained by the final judg[240] ment until the city should pay that indemnity. Nothing further appears to have been done. No expropriation has ever taken place, either according to the mode pointed out by the Code, or the Act of 1832, relative to the opening of streets. The judgment of the district court, which was affirmed, was “ that the injunction be continued in force as relates to the making of the road, until the defendants shall indemnify the plaintiffs for the damages which the establishment of said road may cause them respectively,” &c. The court decided little more than the abstract question of right, to wit, that the front proprietors, or those under whom they hold, having already given one road, according to the condition, express or implied, of the original grant, were not bound to furnish another without indemnity. Surely that judgment did not per se divest them of their title to the land over which the road passes. Until the amount of indemnity shall have been assessed, there is no price of the thing to be forcibly sold, and the Act of 1832 makes the payment of the indemnity or tender and refusal a condition precedent to the divesting of the title. Until then the title of the ancient proprietor is unimpaired.
*511 To concludeUpon a view of the whole matter which this case presents, I am of opinion that the act of incorporation of 1805 did not and could not legally affect the right to alluvion, which belonged to the original tract of land that afterwards composed the Faubourgs Saulet and Delord.
That each part of it fronting on the river was still entitled to the right of accretion, notwithstanding the act of incorporation.
That the laying out of the faubourg in 1806, according to the plan in the record, viewed in connection with other acts of Madame Delord and of the city council, do not furnish legal evidence of a dedication to public uses, and that the purchasers of front lots still remained riparious owners.
That urban property fronting on a watercourse is entitled to alluvion as well as rural estates; and that cities can acquire jure alluvionis only in virtue of a title which would constitute them front proprietors.
That the defendants must be considered as owning down to the 1241] road last laid out, and that the intervention of the road does not in law prevent their being regarded as front proprietors, and entitled to any alluvion which now exists or may hereafter be formed between the levee and the water, subject to the public use under the administration of the municipal authorities.
A majority of the court concurring in these views, it is ordered, adjudgod and decreed, that the judgment of the parish court be annulled, avoided and reversed, and that ours be for the defendants, with costs in both courts; reserving, however, to the public the use of the levee, and of all the alluvion which existed at the inception of this suit, or which now exists, or may hereafter be formed between the levee and the river, to be administered exclusive ly, and its use regulated, according to law, by the city council of the second municipality.